[Criminal No. 627. Filed July 15, 1926.]

[248 Pac. 39.]

# P. K. LEWIS, Appellant, v. STATE, Respondent.

1. CRIMINAL LAW—EVIDENCE TENDING TO SHOW MISAPPROPRIATION OF OTHER FUNDS THAN THOSE ALLEGED IN INDICTMENT HELD ADMISSIBLE, WHERE HANDLING OF SUCH FUNDS AND THOSE ALLEGED WAS SO INTERRELATED AS TO CONSTITUTE BUT ONE TRANSACTION (PEN. CODE 1913, § 503).—Evidence in prosecution for embezzlement under Penal Code of 1913, section 503, tending to show misappropriation of other funds than those alleged in indictment, *held* admissible, where handling of such funds and those alleged was so interrelated as to constitute but one transaction.

2. CRIMINAL LAW.—Competent evidence of charge against defendant is not incompetent because it incidentally shows that he has committed other criminal acts, and, if he desires to have its effect limited he should ask for proper instructions to that end.

3. CRIMINAL LAW.—Question and answer as to profits realized on sales not alleged in indictment for embezzlement, but shown by evidence, though improper, *held*, not prejudicial, where jury could have made such calculations from evidence.

4. EMBEZZLEMENT.—Evidence *held* to justify jury finding that stock sold by bank president, part of proceeds of which were appropriated by him, belonged to bank.

5. BANKS AND BANKING.—Bank president will not be heard to deny that he acted as agent of bank in selling stock owned by it, and proceeds of which he is charged with embezzling.

6. EMBEZZLEMENT — BANK PRESIDENT HELD TO HAVE MISAPPROPRIATED PROCEEDS OF BANK'S STOCK WHICH HE SOLD, RATHER THAN STOCK ITSELF.—Bank president *held* to have misappropriated proceeds of bank's stock which he sold, rather than stock itself, since he was acting within agency in selling it.

7. EMBEZZLEMENT—BANK PRESIDENT'S RELATION TO BANK AND TO STOCK OWNED BY IT, PROCEEDS OF WHICH HE APPROPRIATED, HELD ONE OF TRUST.—Bank president's relation to bank and to stock owned

2. Other offenses as provable in embezzlement, see notes in 105 Am. St. Rep. 976; 11 Ann. Cas. 816; 62 L. R. A. 226, 264; 43 L. R. A. (N. S.) 774. See, also, 10 Cal. Jur. 271; 9 R. C. L. 1295.

5. See 10 Cal. Jur. 248, 252.

7. Existence of trust in property embezzled, see note in L. R. A. 1915B, 442.

by it *held* one of trust as respected liability for misappropriating proceeds, notwithstanding he had originally bought stock himself, where he subsequently carried it as bank investment.

8. EMBEZZLEMENT.—President of bank and of cattle company cannot defeat prosecution for embezzlement of part of price of stock owned by bank and sold to cattle company, by showing that he defrauded cattle company by causing it to pay too much.

9. EMBEZZLEMENT.—Money received by bank president in sale of stock owned by bank and appropriated by him *held* property of bank, notwithstanding it was more than stock was worth and he, as president of buyer, personally guaranteed that company against loss.

10. CRIMINAL LAW—REFUSAL OF INSTRUCTION THAT TRANSFER OF CORPORATE STOCK WAS INVALID UNLESS ENTERED ON BOOKS OF CORPORATION HELD NOT PREJUDICIAL TO BANK PRESIDENT, ACCUSED OF EMBEZZLING PROCEEDS OF STOCK BOUGHT BY HIM BUT OWNED BY BANK, WHICH HAD NOT BEEN TRANSFERRED TO BANK ON BOOKS OF CORPORATION (CIV. CODE 1913, PAR. 2106).—Refusal of instruction that transfer of corporate stock was invalid unless entered on books of corporation, based on Civil Code of 1913, paragraph 2106, *held* not prejudicial to bank president accused of embezzling proceeds of stock bought by him but owned by bank, which had not been transferred to bank on books of corporation, since, as between him and bank, entry of such transfer was unnecessary.

11. EMBEZZLEMENT—INSTRUCTION REQUIRING FINDING THAT DEFENDANT BANK PRESIDENT MISAPPROPRIATED $3,000, OR SOME PART THEREOF GREATER THAN $50, HELD PROPER THOUGH INDICTMENT CHARGED EMBEZZLEMENT OF SPECIFIC SUM OF $3,000.—Instruction requiring finding that defendant bank president misappropriated $3,000, or some part thereof greater than $50, belonging to bank, *held* proper, though indictment charged embezzlement of specific sum of $3,000, where all evidence was directed to that particular item.

12. CRIMINAL LAW.—Instructions, on trial for embezzlement, which did not embrace element of open appropriation under claim of right, *held* not erroneous, where that feature was fully covered in other instructions.

13. CRIMINAL LAW — EMBEZZLEMENT — INSTRUCTION REQUIRING MISAPPROPRIATION BY BANK PRESIDENT OF $3,000 OR SOME PART THEREOF GREATER THAN $50, AND INSTRUCTION REQUIRING CONVERSION OF MORE THAN $50, HELD NOT CONTRADICTORY OR CONFUSING IN VIEW OF INDICTMENT AND PROOF.—Instruction requiring misappropriation by bank president of $3,000 or some part thereof greater than $50 belonging to bank, and instruction requiring conversion of more than $50 belonging to bank, *held* not contradictory or confusing, in

---

12.   See 12 Cal. Jur. 314.

view of indictment charging embezzlement of specific fund of $3,000 and evidence tending to support such charge.

14. CRIMINAL LAW.—Jury's determination of question of fact on conflicting evidence is binding on Supreme Court.

See (1) 16 C. J., p. 588, n. 9.   (2) 16 C. J., p. 597, n. 64, p. 1059, n. 38.   (3) 17 C. J., p. 318, n. 13.   (4) 20 C. J., p. 486, n. 60. (5) 7 C. J., p. 578, n. 6.   (6) 20 C. J., p. 431, n. 43, 44.   (7) 20 C. J., p. 421, n. 89.   (8) 20 C. J., p. 455, n. 33.   (9) 20 C. J., p. 415, n. 49.   (10) 17 C. J., p. 349, n. 93.   (11) 20 C. J., p. 490, n. 87.   (12) 16 C. J., p. 1063, n. 85.   (13) 16 C. J., p. 1036, n. 65. (14) 17 C. J., p. 264, n. 89.

APPEAL from a judgment of the Superior Court of the County of Maricopa. M. T. Phelps, Judge. Affirmed.

Messrs. Struckmeyer, Jennings & Strouss, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. Earl Anderson and Mr. Frank J. Duffy, Assistant Attorneys General, for the State.

ROSS, J.—This case bristles with strange and puzzling transactions, and it is not easy to reconcile them with honesty and fair dealing. We think any disinterested fair-minded person running through the evidence, or hearing it, would conclude that "high finance" of the wildest kind had been carried on. It was all conceived and carried out by the defendant through the instrumentality of certain organizations hereinafter named and described.

The parent institution known as the Central Bank of Phoenix was organized in January, 1915, with defendant as its president. Early in its existence it opened branch banking houses in Willcox and Wickenburg, Arizona. In 1917, at the instigation of defendant, it was determined by the board of directors

14. See 8 Cal. Jur. 587; 2 R. C. L. 194.

of the Central Bank of Phoenix to discontinue the branch houses and in lieu thereof to organize separate corporations to be known as the Central Bank of Willcox and the Central Bank of Wickenburg, and on the twenty-fourth day of April the board of directors passed a resolution authorizing defendant to take the necessary steps to perfect such banking corporations, with a capitalization of $50,000 each, with not less than $15,000 subscribed at the start, and to attend to the proper transfer of the business of the branch houses to the new institutions. In such resolution it was provided that the stockholders of the Central Bank of Phoenix should have a preferred right to subscribe for the stock of the subsidiary concerns, to be allotted in proportion to their holdings in the parent bank.

The Central Bank of Willcox opened its doors for business October 4, 1917, at which time it appears 165 shares of its stock (par value $100) had been subscribed and issued as follows: A. F. Richardson, 30 shares; S. B. Brown, 60 shares; F. W. Rodman, 10 shares; F. B. Harris, 5 shares; and defendant, 60 shares. None of these subscribers paid cash for his stock, but the first four named made their notes for the purchase price payable to the Central Bank of Phoenix, using their stock as collateral, and borrowed the money from the Central Bank of Phoenix. The defendant, however, gave no note, but simply indorsed his certificate in blank and placed it with the bank's (Central Bank of Phoenix) investments, and caused it to be carried on the books of said bank in the account of stocks, bonds, and warrants, for some fourteen months.

The Willcox Bank was given credit on the books of the Phoenix Bank for the sum of said notes, to wit, $10,500, and for the sum of $6,000 on account of defendant's subscription. The 60 shares of stock issued to defendant were carried by the Phoenix Bank

and reported to the bank examiner as assets of that institution.

November 4, 1918, the Central Cattle Loan & Trust Company was organized, with charter powers to engage in a general loan business and to buy and sell securities. It had its office in the banking house of the Phoenix institution, which office was reached through the bank, or a door from an alley. Its president was the defendant.

On December 4, 1918, this last-named organization, to which we shall refer as the Cattle Company, sold to the Phoenix Bank notes of the purchasers of its stock, for which the bank gave the Cattle Company credit in the sum of $31,013.05. On the same day defendant sold to the Cattle Company 140 shares of the Central Bank of Wickenburg (par value $100) at $150 per share, and the 60-share certificate of the Central Bank of Willcox at $150 per share, and obtained from the Cattle Company a check on the Central Bank of Phoenix payable to himself for $30,000. This, in turn, was deposited by defendant in the Phoenix Bank to his credit. On the same day defendant took out of the Central Bank of Phoenix, from its stocks, bonds, and warrants, the certificate of 60 shares of the Willcox Bank theretofore issued to him; also 40 bonds, of the par value of $500 each, and seven bonds, of the par value of $100 each, of the Anchor Trust Company; and gave his check for $27,217.50 to the Phoenix Bank to cover same, itemized as follows: For 60 shares of the Willcox Bank, $6,000; for 47 bonds of Anchor Trust Company, $20,700, and interest thereon, $517.50.

The Anchor Trust Company's bonds the defendant exchanged for 200 shares of the capital stock of the Central Bank of Willcox, 140 shares of which he sold to the Cattle Company for $150 per share, as above stated, along with the 60 shares of the Willcox Bank at $150 per share.

The defendant was indicted for embezzling $3,000 of the moneys of the Central Bank of Phoenix, under section 503 of the Penal Code, defining such offense by a banker entrusted with or having control of property for the use of another person. Under such definition, a banker who fraudulently appropriates such property to any use or purpose not in the due and legal execution of his trust is guilty of embezzlement. At the trial the prosecution elected to try defendant for the fraudulent appropriation of the $3,000 profit on the sale of the 60 shares of the Central Bank of Willcox to the Cattle Company, it appearing that such shares were bought for $6,000 and sold for $9,000. Defendant was tried, convicted and sentenced to serve not less than five and not more than eight years in the state prison, and he appeals.

The first two assignments of error are directed at the rulings of the court in admitting, over defendant's objections, testimony of the witness George W. Brown while testifying as an expert accountant concerning what he discovered in auditing the books of the different institutions, especially as to what had become of the Anchor Trust Company's bonds and the 140 shares of the Wickenburg Bank stock. It is said that this testimony was not material or relevant to the issues and tended to excite bias and prejudice in the minds of the jury. From the statement of what took place on December 4, 1918, it will be seen that the credit in the parent bank to defendant was secured and manipulated by him through the use of the Anchor Trust Company's bonds and the Wickenburg Bank stock, and that the check with which he paid for the 60 shares of the Willcox Bank also paid for the Anchor Trust Company's bonds. The credits and debits shown on December 4th to the Cattle Company and the defendant with the Central Bank of Phoenix were but one transaction

in fact, and if in showing acts of defendant touching the 60 shares of the Willcox Bank the evidence tended to show unlawful appropriation by him of the Anchor Trust Company's bonds and the Wickenburg Bank stock, it was because it necessarily trailed defendant's tracks on that particular occasion.

We recognize the rule that acts of the defendant other than the one for which he is being tried should not generally be shown, but there are exceptions to this rule. One of such exceptions is that if the competent evidence of the charge laid against a defendant incidentally also shows or tends to show, he has committed other acts of a criminal character, it is not thereby rendered incompetent; and if a defendant desires to have its effect limited he should ask for proper instructions to that end. 16 C. J. 588, § 1132 (2). The handling by defendant of the funds and investments of the Central Bank of Phoenix and the stocks and bonds was so interrelated as to time and circumstance that each constituted in fact but one transaction. Each seemed to be a necessary step for the defendant to take to consummate his purpose of getting for himself some ready cash.

The third assignment relates to the admission, over objection, of testimony of the witness George W. Brown as to defendant's profits in the disposition of the 140 shares of the Central Bank of Wickenburg, and the 60 shares of the Central Bank of Willcox to the Cattle Company. The question and answer objected to were probably improper, but if the evidence upon which the answer was based was properly admitted the witness only stated what already appeared to the jury; that is, that defendant had obtained these stocks for $100 and sold them for $150 per share, thereby making on the Wickenburg stock $7,000 and on the Willcox stock $3,000. This bit of testimony would hardly have

prejudiced the rights of the defendant, since the jury could as easily have made the calculations as the witness.

It is next assigned that the court erred in refusing, upon defendant's motion at the close of the case, to direct a verdict on the ground of the insufficiency of the evidence to support the charge, and under this assignment defendant gives six reasons for his contention. We will take these up in their order.

"(1) The evidence fails to show that the 60 shares of the Central Bank of Willcox stock ever did belong to, or was the property of, the Central Bank of Phoenix."

This contention involves the consideration of the evidence of the title to the Willcox certificate of stock. We have stated the testimony, or most of it, of the prosecution on that question. This stock was subscribed for by defendant; it was issued to him and by him indorsed in blank and placed with the bank's other investments and carried on its books under the heading of stocks, bonds and warrants. It was therefore carried as an investment and reported to the bank examiner as one of the bank's assets. The bank's money was used to pay for it, and defendant made no entry upon the bank's books charging himself with such money, or showing an intention to hold himself liable therefor. It is in evidence that a loan in banking is never carried in the bank's investment accounts under stocks, bonds, and warrants, but in its notes and discount accounts. The testimony introduced by the defendant to show he was the owner of the stock consisted of that of two witnesses:

E. T. Collings, a director of the Central Bank of Phoenix, testifying in behalf of defendant, said he saw the 60 shares of Willcox stock in the bank and asked defendant what it was doing there, and if he had given the bank his note to cover the advance

made for it; that defendant replied that he had not given his note; that he was holding it temporarily to sell; that it was his stock; and that he had sold it. Later this witness learned through defendant that he had disposed of stock and paid the profits or interest to the bank; that defendant had told him so.

J. J. Fagan, who was an assistant cashier of the Central Bank of Phoenix on December 4, 1918, and for some time prior thereto, testifying in behalf of defendant, stated that the latter took up on that day the 60 shares of the Willcox Bank "along with some other securities," witness waiting on him. This witness stated that the reason he did not send to the Willcox Bank the certificate for the 60 shares for cancellation and reissue to the Central Bank of Phoenix was because it was being held for Mr. Lewis (defendant), who had told him he would take it up when he had funds. But this witness on cross-examination admitted this certificate was carried in the bank's account of stocks, bonds and warrants, and stated it belonged to the bank but that the bank had resold it to defendant. In effect this witness seemed to say that there was a tacit understanding that the bank would carry this stock for defendant Lewis until he could dispose of it.

It will be noted what Collings testified to as to the ownership of the 60 shares was what defendant had told him. If defendant had paid interest on the $6,000 used to buy this certificate of stock, it would have been an easy matter to turn to the books of the bank and ascertain when it was paid and the amount. This was not done. Interest on $6,000 for fourteen months is not so insignificant a sum as to be difficult to locate or trace. So, the jury must have concluded that the Willcox stock was the property of the Central Bank of Phoenix and not of the defendant, and upon the facts before them we think their conclusion was justified.

"(2) There is no evidence that the 60 shares of Bank of Willcox stock were ever sold to the Cattle Company by or on behalf of. the Central Bank of Phoenix."

We do not think it lies in the mouth of defendant to say he did not, in selling the Willcox stock to the Cattle Company, act as the agent of the Central Bank of Phoenix, of which he was president.

"(3) The evidence is conclusive that if there was any appropriation or conversion, it was of the stock itself and not of the proceeds."

If defendant had the right to invest the bank's money in the stock of the Willcox Bank, it would seem that he had the right to sell such stock and in doing so would be acting within his implied powers as president of the Central Bank of Phoenix. The evidence abundantly discloses that defendant was in complete control, not only of such bank, but of the Cattle Company, the buyer of the stock. He caused the bank to discount the Cattle Company's notes so that the latter with the money thus obtained from the bank could buy the Willcox stock, which it did for $9,000, or $3,000 more than defendant accounted for to the bank, the owner of such stock. We think the facts show defendant's act in selling stock to the Cattle Company was clearly within his agency and that he did not convert the stock in doing so.

"(4) The evidence fails to show that the money alleged to have been embezzled was received by the defendant as president or agent of the Central Bank of Phoenix, or that the money was received by the defendant for or on behalf of said bank or for its use and benefit."

The defendant contends that the evidence fails to show that his relation to the bank and the Willcox stock was one of trust, or that he came into the possession and control of such stock by virtue of his

trust. The whole record, we think, refutes this contention.

"(5) If, as the state contends, the Willcox stock was sold by the defendant to the Cattle Company for $9,000, it was a fraud on the Cattle Company, since the undisputed evidence is that the Willcox stock never was worth over $6,000, and the Central Bank of Phoenix could claim no benefit by the fraud. The defendant was accountable to the Cattle Company, not the Central Bank of Phoenix, for the $3,000 excess."

The undisputed fact is that defendant received for the Willcox stock from the Cattle Company $9,000. If it was not worth more than $6,000, that is no concern of the Central Bank of Phoenix. As between the Cattle Company and the defendant a different question might arise. If the defendant, who was the master of the Cattle Company, fraudulently and wrongfully caused it to pay $9,000 to the Central Bank of Phoenix, or its agent, for a piece of paper worth only $6,000, the Cattle Company doubtless could in a proper action recover the excess. However, we do not understand the law to be that the defendant could take advantage of a fraud practiced upon the Cattle Company to defeat this action charging him with embezzlement of the $3,000 accruing to the Central Bank of Phoenix by reason of such imposition.

"(6) The 60 shares of stock were never sold to the Central Cattle Loan & Trust Company for $9,000, but for the sum of $6,000, and there never was any $3,000 profit."

The Secretary of the Cattle Company testified that the $9,000 given to defendant for the Willcox stock was in the nature of a loan, it being understood at the time that defendant would sell such stock and make good to the Cattle Company any deficit. This understanding was not made a matter of bookkeep-

ing, the books showing it a completed transaction.
Later, some two years after, the Cattle Company's
books show that the Willcox stock was sold to one
Welty for $6,000, and that the deficit of $3,000 was
paid. The complete control of the Cattle Company's
books by defendant and the abandon with which he
used its properties, as also that of the bank, doubt-
less impressed the jury that the later book entries
did not speak the truth. The controlling fact, how-
ever, is that defendant got $9,000 actual cash for
the stock, and if he wanted to personally guarantee
the Cattle Company against loss it would not make
the $9,000 received any less the money of the Central
Bank of Phoenix.

The 60 shares of Willcox stock was not sent to that
corporation for cancellation and reissue. Using that
fact as a basis, the defendant asked the court to in-
struct the jury as follows:

"You are instructed that no transfer of the stock
in a corporation shall be valid except as between the
parties thereto, until the same is regularly entered
upon the books of the company so as to show the
names of the persons by and to whom the transfer is
made, the number or other designations of the shares,
and the date of the transfer. Civil Code, 2106."

While this instruction states a correct rule of law,
we cannot see where the failure to give it could pos-
sibly have prejudiced the defendant. As between
defendant and the Central Bank of Phoenix, it was
not necessary to have the transfer from defendant
to the bank entered upon the books of the Central
Bank of Willcox, and, since it appears from the
evidence the defendant had complete control over
the matter, the omission to have the same canceled
and reissued to the Central Bank of Phoenix should
not afford defendant the basis of an argument that
he and not the bank was the owner.

The next two assignments are directed at the instructions.

In the indictment defendant was charged with embezzling $3,000 belonging to the Central Bank of Phoenix. The evidence was all directed at the item of profit in selling the 60 shares of the Willcox stock to the Cattle Company. One of the essentials to conviction, as enumerated by the court, was that the defendant by virtue of his office and employment as president and agent of the Central Bank of Phoenix must have had in his possession or control, for the use and benefit of said corporation, the sum of $3,000 in money of the property of the corporation, and that he fraudulently and feloniously appropriated said sum of $3,000, or some part thereof greater than $50, to his own use.

In another instruction immediately following the above, the court enumerated the essentials necessary to a conviction of embezzling, such as fiduciary capacity, agency, unlawful appropriation, and stated generally that if the defendant converted "to his own use more than $50 of the money so in his possession or under his control by virtue of his said trust, you should find the defendant guilty as charged in the indictment."

These instructions are criticised by the defendant because, it is said, they permitted the jury to find that the defendant had appropriated to his own use, "not the particular money charged in the indictment to have been embezzled, but any money of the Central Bank of Phoenix greater than the sum of $50," and because they did not embrace the element of open appropriation under claim of right, and are contradictory and confusing.

The whole theory of the prosecution was that defendant had embezzled the particular $3,000 arising from the profits on the Willcox stock. The evidence all is directed to that particular item. We assume

that the jurors were men of fair intelligence and understood from the instructions that defendant was being tried upon that item and no other. The reason the court did not require that the jury find by its verdict the misappropriation of the total sum of $3,000 is because the statute makes the embezzling of $50 a felony, and we think the import of the court's language clearly shows that the jury should find the defendant appropriated the $3,000 charged in the indictment, or some part thereof greater than the sum of $50.

These particular instructions do not embrace the element of open appropriation under claim of right, but in other instructions given that feature is fully covered.

We cannot see wherein these instructions are contradictory and confusing when considered in connection with the charge in the indictment and the evidence introduced at the trial.

There are three other assignments, in form a recapitulation of the ones we have considered. We therefore do not find it necessary to state them, inasmuch as what we have already said fully disposes of them.

It will be noted that the serious questions in this case were of facts, the defendant contending that he was the owner at all times of the 60 shares of stock in the Willcox Bank. As against his contention there is much evidence of a most convincing character. The jury believed the evidence of the prosecution and not that of the defendant, and their determination of this crucial point we regard as binding upon us.

The defendant, who no doubt had a greater and a more intimate familiarity with all the facts than anyone else, refrained, as he had a right to, from going upon the stand and explaining to the jury the remarkable and unusual manner of handling the

Willcox stock. Probably it .was because it was inexplainable upon any theory of honesty and rectitude of purpose. The bald facts laid before the jury stared him in the face: He had taken $6,000 out of the bank and paid for these 60 shares of stock and carried the certificate as a bank investment for fourteen months and then sold it for $9,000 real money. He did this while he was president of the bank. To effect the deal he used no funds of his own nor charged himself with any. How then could he claim the $3,000 profit, or deny the bank's ownership of the stock?

These and other incidents of the case were not explained to the jury, and probably could not be explained.

The judgment of the lower court is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.